UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

v.

JAMIR MORRIS,

    Defendant.
_____/

Case No. 2:24-cr-20339-2

Honorable Susan K. DeClercq
United States District Judge

**OPINION AND ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS EVIDENCE (ECF No. 36)**

On June 11, 2024, Jamir Morris was arrested at a gas station in Detroit. He was charged with being a felon in possession of a firearm under 18 U.S.C. § 922(g)(1) and with illegal possession of a machinegun under 18 U.S.C. § 922(o), after a gun fell from his waistband while he attempted to flee from the police. Morris now moves to suppress the gun, arguing that the arresting officer had neither reasonable suspicion to conduct a *Terry* stop and frisk, nor probable cause to arrest him. As explained below, Morris is wrong on both fronts, so his motion will be denied.

## I. BACKGROUND

On the night of June 11, 2024, a Detroit Police Department officer was monitoring security-camera footage at a "green light"[1] gas station in Detroit. ECF No. 53 at PageID.234. Around 10:50 PM, that officer notified others on patrol that he saw a man in a gray hoodie with what looked like an imprint of a gun in the hoodie's front pocket. *Id.* at PageID.234–35. The man in the hoodie was *not* Jamir Morris, but one of his companions, DeJuan Walker.[2] *Id.* at PageID.235.

Three patrolling officers, including Officer Latifa Alasad-Craig, arrived at the gas station to look for Walker. *Id.* But immediately upon entering the store, Alasad-Craig noticed Morris instead, who was standing at the checkout counter:



Ex. D, Raines Bodycam, at 00:29–00:31.

---

[1] As the arresting officer, Latifa Alasad-Craig, testified during the suppression hearing, a "green light" location is one that has its security-camera footage monitored live 24/7 by the police department.

[2] Walker is a codefendant in this case but is not a party to this motion.

Alasad-Craig "immediately observed" Morris to have what she believed to be the imprint of a firearm in his front waistband:



Ex. A, Alasad-Craig Bodycam, at 00:32; ECF No. 53 at PageID.235. Specifically, Alasad-Craig testified that she saw an L-shaped bulge in the middle part of Morris's groin area. She further testified that, in her training and experience, L-shaped bulges are usually firearms, and that the bulge in Morris's pants was consistent with the size of a handgun. Alasad-Craig also stated that she most often recovers concealed firearms from a person's front waistband, either from inside of the pants or in a pocket.

Believing the bulge to be a firearm, Alasad-Craig then asked Morris whether he had a concealed-pistol license (CPL). Ex. A, Alasad-Craig Bodycam, at 00:31. Morris, who had his hands raised to his chest, did not respond, but slightly lowered

- 3 -

his hands. *Id.* at 00:32. At that point, Alasad-Craig grabbed Morris's arm and told him to put his hands up. *Id.* at 00:33. Alasad-Craig testified that she grabbed Morris for safety reasons because she did not want him reaching towards his waistband, where she believed the gun to be. After grabbing Morris, Alasad-Craig asked him again whether he had a CPL. *Id.* at 00:34. This time, Morris responded "no." *Id.* So Alasad-Craig told Morris to place his hands behind his back and started putting him in handcuffs. *Id.* at 00:36. This interaction—from Alasad-Craig first asking whether Morris had a CPL, to her starting to place him in handcuffs—took about six seconds. *See id.* at 00:31–00:37.

As Alasad-Craig cuffed Morris's left wrist, he pulled his right arm away. *Id.* at 00:47. Alasad-Craig ordered Morris not to resist and then finished placing him in handcuffs. *Id.* at 00:51.

At the same time, the two other officers who arrived with Alasad-Craig approached Walker, the original suspect in the gray hoodie. Ex. B, Green Light Footage, at 04:25. When those officers attempted to detain Walker, Morris began to pull away from Alasad-Craig and tried to flee. *Id.* at 04:55. Morris dragged Alasad-Craig outside the gas station as he tried to wrestle away from her. *Id.* Outside, Morris's pants began to fall down, and a handgun fell out of his waistband. Ex. C, Alasad-Craig Bodycam Part 2, at 00:19. Morris fell to the ground, and officers were able to detain him. Ex. E, Mitchell Bodycam.

On September 23, 2024, Morris filed a motion to suppress, ECF No. 36, which has been fully briefed, ECF Nos. 53; 59. The Court held a suppression hearing on December 18, 2024, in which Alasad-Craig testified to her relevant experience. Alasad-Craig has been a police officer for five and a half years. For the past three years, she has been a member of the Detroit Police Department's gang-enforcement unit, whose primary directive is addressing gun and drug offenses. During this work, she has experience identifying concealed weapons and has recovered over 200 firearms. She is also a firearms inspector and is familiar with the size, shape, and weight of common handguns.

## II. STANDARD OF REVIEW

"The exclusionary rule generally bars the admissibility at trial of tangible evidence . . . acquired through unconstitutional means." *United States v. Akridge*, 346 F.3d 618, 623 (6th Cir. 2003) (citing *Wong Sun v. United States*, 371 U.S. 471, 485 (1963)). Defendants bear the burden of proving a Fourth Amendment violation when moving to suppress evidence. *United States v. Evers*, 669 F.3d 645, 651 (6th Cir. 2012). This burden extends to both "the burden of production and persuasion." *United States v. Patel*, 579 F. App'x 449, 453 (6th Cir. 2014).

## III. DISCUSSION

Morris argues that the gun must be suppressed because (1) Alasad-Craig lacked reasonable suspicion to conduct a *Terry* stop of him, and (2) Alasad-Craig

lacked probable cause to arrest him, making any evidence obtained during the interaction inadmissible. Each argument will be addressed in turn.

### A. The *Terry* Stop

The Fourth Amendment to the United States Constitution protects against "unreasonable searches and seizures." U.S. CONST. amend. IV. At the same time, the Fourth Amendment permits police officers to conduct "temporary investigative detentions, known as *Terry* stops, so long as there is 'a reasonable suspicion supported by articulable facts'" that a person has engaged in or is about to engage in criminal activity. *United States v. McCallister*, 39 F.4th 368, 373 (6th Cir. 2022) (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)); *see also Terry v. Ohio*, 392 U.S. 1, 30 (1968). During a *Terry* stop, officers may also conduct a precautionary search for weapons if there is "reasonable suspicion that the person searched may be armed and dangerous." *Id.* (quoting *United States v. Pacheco*, 841 F.3d 384, 390 (6th Cir. 2016)).

Reasonable suspicion is not, to put it lightly, the most precise of inquiries. *Id.* (noting that reasonable suspicion "is not readily, or even usefully, reduced to a neat set of legal rules" (quoting *Sokolow*, 490 U.S. at 7)). But at the very least, it means that officers must act on more than a mere "hunch." *United States v. Foster*, 376 F.3d 577, 585 (6th Cir. 2004) (quoting *Terry*, 392 U.S. at 27). Specifically, an officer may

act on "reasonable inferences which he is entitled to draw from the facts in light of his experience." *Terry*, 392 U.S. at 27.

Reasonable suspicion is also an objective, totality-of-the-circumstances analysis. *See Foster*, 376 F.3d at 584–85 (quoting *United States v. Hurst*, 228 F.3d 751, 757 (6th Cir. 2000)); *United States v. Jordan*, 100 F.4th 714, 719 (6th Cir. 2024) ("[C]ourts must assess whether everything the officer observed, taken together and in context, is objectively suspicious."). Further, "otherwise innocent activity can form the basis for reasonable suspicion." *Jordan*, 100 F.4th at 719 (citation omitted).

When analyzing a Fourth Amendment challenge to a *Terry* stop, courts must do two things. First, the Court must determine the moment that a defendant was "seized." *See United States v. Turner*, No. 23-20284, 2024 WL 3251273, at *4 (E.D. Mich. July 1, 2024). Then, the Court must evaluate whether, at that moment, the officers had a reasonable suspicion supported by articulable facts for that seizure. *Id.*

### 1. Moment of Seizure

To determine whether an officer has "seized" someone, courts must evaluate whether the officer "restrain[ed] the person's freedom of movement by means of physical force or a show of authority." *United States v. Mendenhall*, 446 U.S. 544, 552 (1980). Put otherwise, a seizure has occurred if "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Johnson*, 620 F.3d 685, 690 (quoting

*Michigan v. Chesternut*, 486 U.S. 567, 573 (1988)). Some circumstances indicating a seizure include "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person . . . or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Mendenhall*, 446 U.S. at 554.

Here, Morris was seized when Officer Alasad-Craig grabbed his arm. At that moment, Alasad-Craig "restrain[ed] [Morris's] freedom of movement by means of physical force or a show of authority." *Mendenhall*, 446 U.S. at 553. After being grabbed on the arm by an officer and told "put your hands up," no reasonable person would believe that he was free to leave. *Johnson*, 620 F.3d at 690.

### 2. Reasonable Suspicion

Thus, the question becomes: when Alasad-Craig grabbed Morris, did she have reasonable suspicion to seize him? To answer this, it is helpful to recall what had, and had not yet, happened by this point: Morris had not yet answered "no" to Alasad-Craig's question of whether he had a CPL, and Alasad-Craig had seen what she believed to be an imprint of a gun—but not a gun itself.

Morris argues that an imprint of a gun, standing alone, is not enough for reasonable suspicion. ECF No. 36 at PageID.105. He says that the Government needs more than one isolated factor to support the totality-of-the-circumstances analysis for reasonable suspicion. ECF No. 59 at PageID.275. Morris also notes that

he had not admitted to Alasad-Craig that he was carrying a gun, nor had she felt a gun or confirmed exactly what the imprint was. ECF No. 36 at PageID.105. Thus, Morris argues that Alasad-Craig could have had no more than a hunch about the imprint, which is not enough for a *Terry* stop. *Id.*

However, Morris offers no case in which reasonable suspicion required an officer to feel a gun or wait for an admission. Rather, the case law appears to point in the opposite direction—that seeing an imprint of a gun can establish reasonable suspicion in the right circumstances. *United States v. Bell*, 572 F. App'x 417, 419 (6th Cir. 2014) ("The officer's belief, based on his eyewitness observations, that the defendant had a bulge in his pocket that was in the shape of a gun provides 'reasonable suspicion' under the *Terry* doctrine that the defendant was carrying a concealed pistol."); *Turner*, 2024 WL 3251273, at *6 ("An officer's observation of an 'imprint' of a firearm has been held sufficient to establish reasonable suspicion.").

Here, likewise, seeing the imprint of a gun gave Alasad-Craig reasonable suspicion to stop and frisk Morris. Because she was present at the gas station specifically to look for concealed firearms, it was reasonable for Alasad-Craig to be scanning each patron in the store—including Morris, even though he was not the original suspect. And like the officer in *Bell*, Alasad-Craig did not testify to an amorphous bulge, but rather that the imprint on Morris was the shape and size of a

gun. *See* 572 F. App'x at 419. She based this inference on her years of experience investigating gun crimes and inspecting firearms. *See id.*

True enough, as Morris points out, *Bell* also based its decision on other factors, like the late hour of the night and the fact that robberies and shootings had recently occurred in the area. ECF No. 59 at PageID.276 (citing *Bell*, 572 F. App'x at 419). But those factors arguably exist here, too: the incident occurred relatively late at night, around 11:00 PM, and in a relatively higher crime area.[3] In any event, these factors carry less weight here, especially because the Government did not rely on them, and they are not necessary to find reasonable suspicion.

Morris also argues that a gun imprint cannot create reasonable suspicion because in Michigan, it is not a crime to carry a concealed pistol with the proper licensure. ECF No. 36 at PageID.106–07 ("It simply cannot be true that observing what appears to be an imprint of a gun automatically gives officers reasonable suspicion to stop and frisk citizens in a concealed-carry state," because officers cannot disregard "the decision of the legislature to allow concealed possession of guns by using such possession to justify *Terry* stops and frisks.").

---

[3] Again, the events here took place at a "green light" gas station, and the green-light program specifically targets "high-crime businesses in the city to reduce crime and to improve public safety." *Program Profile: Project Green Light Detroit*, NAT'L INST. OF JUST., https://crimesolutions.ojp.gov/ratedprograms/project-green-light-detroit#0-0 [https://perma.cc/3CPP-3V3V] (last visited Jan. 16, 2025).

However, this argument overlooks the relevant statutory scheme in Michigan. To start, Michigan law prohibits carrying a concealed firearm on one's person or in one's vehicle without a CPL. MICH. COMP. LAWS § 750.227(2). People must carry their CPL with them at all times and must show the CPL upon request by an officer. *Id.* § 28.425f. Further, when stopped by a police officer, people "shall immediately disclose to the officer" that they are carrying a firearm. *Id.*

For this reason, courts interpreting Michigan law have explained that carrying a concealed weapon is presumptively illegal subject to the person producing evidence of a license. *See United States v. Patterson*, No. 22-CR-20269, 2023 WL 4290051, at *3 (E.D. Mich. June 30, 2023) (collecting cases); *United States v. Williams*, 483 F. App'x 21, 27 (6th Cir. 2012) (noting that, as a result of Michigan's statutory scheme, "merely showing that a defendant carried a pistol . . . establishes a prima facie violation of state law; at that point, it is up to the defendant to raise the issue of licensure and offer proof that his possession was lawful." (citing *People v. Henderson*, 218 N.W.2d 2, 4 (Mich 1974))).

Because of this presumption of illegality, the "incriminating nature" of a gun imprint on Morris would be "immediately apparent." *United States v. Galaviz*, 645 F.3d 347, 356 (6th Cir. 2011). That is, as soon as Alasad-Craig saw the gun imprint on Morris, she was entitled to conduct a *Terry* stop and frisk to investigate whether Morris was lawfully carrying a concealed weapon. *Id.* Of course, had Morris

produced evidence of a CPL, he would have overcome the presumption of illegality, and the justifications for the *Terry* stop would have evaporated right then and there. However, because he was unable to do so, the *Terry* stop could lawfully continue.

In sum, Alasad-Craig had reasonable suspicion to conduct a *Terry* stop and frisk of Morris at the time she seized him. As such, the stop did not violate the Fourth Amendment, so this argument does not provide a basis to suppress the gun.

### B. The Arrest

Morris also argues that the gun must be suppressed because Alasad-Craig lacked probable cause to arrest him. ECF No. 36 at PageID.108. He says that he was arrested the moment he was placed in handcuffs. *Id.* However, the Government disputes this characterization, arguing that putting Morris in handcuffs was simply part of the *Terry* stop. ECF No. 53 at PageID.246. Rather, the Government says that Morris was not arrested until after he attempted to flee, when he was outside the gas station. *Id.* at PageID.249.

The Government has the better argument. "During a *Terry* stop, officers may . . . use handcuffs 'so long as circumstances warrant that precaution.'" *Dorsey v. Barber*, 517 F.3d 389, 399 (6th Cir. 2008) (quoting *Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 309 (6th Cir. 2005)); *Houston v. Clark Cnty. Sheriff Deputy John Does 1–5*, 174 F.3d 809, 815 (6th Cir. 1999) ("Nor does the use of handcuffs exceed the bounds of a *Terry* stop, so long as the circumstances warrant that precaution.").

Indeed, more drastic actions than simply handcuffing have been found to be within the scope of a permissible *Terry* stop. *See, e.g.*, *United States v. Boyett*, 295 F. App'x 781, 785 (6th Cir. 2008) ("Holding subjects at gunpoint, handcuffing them, and placing them in a squad car does not turn a *Terry* stop into an arrest where the police officers 'reasonably fear that suspects are armed and dangerous.'" (quoting *Houston*, 174 F.3d at 815)).

True enough, a *Terry* stop may indeed ripen into an arrest through the passage of time or the use of force. *See United States v. Sharpe*, 470 U.S. 675, 685–86 (1985); *Centanni v. Eight Unknown Officers*, 15 F.3d 587, 590 (6th Cir. 1994), *cert. denied*, 512 U.S. 1236 (1994). And when this happens, suspects must be detained based upon probable cause. *United States v. Avery*, 137 F.3d 343, 349 (6th Cir. 1997). "Although there is no bright line that distinguishes an investigative stop from a *de facto* arrest, the length and manner of an investigative stop should be reasonably related to the basis for the initial intrusion." *Houston*, 174 F.3d at 814 (internal citations omitted).

However, when Morris was placed in handcuffs, not much time had passed from the initial stop; at most, only a few seconds had gone by. *Sharpe,* 470 U.S. at 685–86. Further, Alasad-Craig's actions, including her use of force, were "reasonably related" to the basis for the initial intrusion. *Houston*, 174 F.3d at 814. That is, Alasad-Craig had reason to believe that Morris was carrying a concealed firearm, and that the firearm was within arm's reach. Because Alasad-Craig believed

- 13 -

that Morris was armed and dangerous, it was reasonable for her to place him in handcuffs for public safety while she conducted the stop and frisk. *Boyett*, 295 F. App'x at 785. Doing so did not transform the *Terry* stop into an arrest.[4] *See United States v. Stevenson*, No. 21-20375, 2021 WL 5585921, at *5 (E.D. Mich. Nov. 30, 2021); *United States v. Bridges*, No. 16-20089, 2016 WL 3922354, at *6 (E.D. Mich. July 21, 2016) (finding it permissible, as part of *Terry* stop, for officers to handcuff defendant, place him in patrol car, and check computer to determine if he had a CPL).

Rather, Alasad-Craig arrested Morris outside the gas station, after he attempted to flee. And, importantly, the officers had probable cause to arrest Morris at that point. By then, Morris had admitted that he did not possess as CPL, and the officers had recovered a gun that had fallen from Morris's waistband. These facts gave the officers a sufficient basis to conclude that Morris was illegally carrying a concealed weapon without a license. *See Smith v. City of Wyoming*, 821 F.3d 697, 714–15 (6th Cir. 2016) (detailing probable-cause standard).

Because Morris's arrest did not violate the Fourth Amendment, it does not provide a basis to suppress the gun, either.

---

[4] Although Alasad-Craig testified she believed she was arresting Morris at the moment she first handcuffed him, this testimony about her own subjective judgment is not dispositive. Indeed, whether a *Terry* stop becomes an arrest is an objective inquiry—one that "is judged by examining the reasonableness of the officers' conduct in light of the surrounding circumstances and their suspicions." *See United States v. Campbell*, 549 F.3d 364, 372 (6th Cir. 2008).

## IV. CONCLUSION

Accordingly, it is **ORDERED** that Morris's Motion to Suppress Evidence, ECF No. 36, is **DENIED**.

                                                  */s/Susan K. DeClercq*
                                                  SUSAN K. DeCLERCQ
                                                  United States District Judge

Dated: January 16, 2025